IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____
                                        )
JOHN ARRINGTON DREWRY, et al.,          )
                                        )
        Plaintiffs,                     )
                                        )
        v.                              )        Civil Action No. 3:07CV624
                                        )
STARR MOTORS, INC.,                     )
                                        )
        Defendant.                      )
_____)

## MEMORANDUM OPINION

This matter is before the Court on Defendant Starr Motors, Inc.'s ("Defendant") motion for summary judgment (docket entry no. 26); Plaintiffs John and Elizabeth Drewry's ("Plaintiffs") cross-motion for partial summary judgment (docket entry no. 32); Defendant's motion to strike Plaintiffs' cross-motion for partial summary judgment (docket entry no. 35); and Defendant's motion to vacate the Court's Order granting Plaintiffs' motion to amend (docket entry no. 43). The issues have been fully briefed and argued such that the matter is ripe for resolution. For the reasons set forth herein, Defendant's motion for summary judgment will be GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for partial summary judgment will be DENIED, as will Defendant's motions to strike and to vacate the Court's subject Order

### I.  Factual Background

Plaintiffs wished to purchase an automobile (2005 Dodge Neon) from Defendant. (Compl. at ¶ 16-17.)  In order to purchase the vehicle, Plaintiffs needed to obtain financing.  (Id.)  Defendant conducted a credit check on Plaintiffs, with their express authorization, and they

signed a Retail Installment Sales Contract (RISC) after being told that Bank of America would finance the loan for the automobile.  (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 1.)  However, when Bank of America discovered thereafter that Plaintiffs were self-employed, it rescinded its initial agreement to finance the loan.  (Id.)  Plaintiffs then returned to Defendant upon the dealership's request, and signed a second contract which provided for a different entity, CitiFinancial, to finance the loan.  (Pls.' Am. Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pls.' Cross Mot. for Summ. J. ("Pls.' Am. Mem.") at 2.)  This contract was also subsequently rejected by the proposed lender due to Plaintiffs' self-employment status. (Id.)  Finally, Defendant asserts that it agreed to finance the automobile for Plaintiffs, and asked Plaintiffs to sign yet a third contract.  (Def.'s Mem. at 5.)  Plaintiffs decided at that juncture that they no longer wished to purchase the vehicle, and voluntarily returned it to the dealership. (Compl. at ¶ 30.)  Plaintiffs never made a monthly payment on the vehicle, and they instructed their bank to stop payment on the down payment check that they had provided toward the purchase price of the automobile.  (Def.'s Mem. at 6.)  After the automobile was returned to the dealership, Defendant notified Plaintiffs that it would be auctioning the automobile in a public sale.  (Id.)  Plaintiffs did not attend the auction, and Defendant subsequently sold the automobile to another purchaser in a private transaction after being unable to do so at the public sale.  (Id.)

## II.  Procedural History

On October 15, 2007, Plaintiffs filed the five-count complaint herein, naming as defendants: Starr Motors, Inc., Bank of America, HSBC Auto Finance, Inc., Suntrust Bank, and Wells Fargo Auto Finance, Inc.  All of the defendants, with the exception of Starr Motors, Inc.,

have resolved the claims against them by settlement with Plaintiffs and are no longer parties to the case.

On April 1, 2008, Defendant filed a motion for summary judgment. On April 22, 2008, Plaintiffs filed a cross-motion for partial summary judgment and memorandum in opposition to Defendant's motion for summary judgment. On April 24, 2008, Defendant filed a motion to strike Plaintiffs' cross motion for partial summary judgment, contending that although the Court granted leave for Plaintiffs to file a response brief twenty-one days after such brief was due, leave was never granted for Plaintiffs to file a late dispositive motion. That same day, Plaintiffs filed a motion to amend/correct their memorandum in opposition to Defendant's motion for summary judgment. Defendant filed a reply on April 28, 2008. The next day, on April 29, 2008, the Court granted Plaintiffs' motion to withdraw their original motion for partial summary judgment and to file a new memorandum. Defendants then filed a motion to vacate the Order, due to the fact that Plaintiffs had incorrectly represented that Defendant consented to Plaintiffs' motion to amend.[1]

### III.  Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering whether to grant a motion for summary judgment, the court must assess the evidence

---

[1] Plaintiffs' counsel conceded the point at oral argument and the Court is satisfied that the mistake resulted from excusable inadvertence (or old age!).

offered by both parties and "determine whether there is a genuine issue for trial" after viewing

the evidence in the light most favorable to the non-moving party and resolving all factual

disputes in that party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The

Court must "resolve all factual disputes and any competing, rational inferences in the light most

favorable" to non-moving party.  Id. (citation omitted).  Nonetheless, this Court is not to make

credibility determinations, as that task is for the fact finder.  Anderson, 477 U.S. at 255.

To defeat a summary judgment motion, the non-moving party may not rest upon mere

allegations or denials, but must "set forth specific facts showing that there is a genuine issue for

trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In essence, the Court must decide if

the evidence when viewed in the light most favorable to the non-moving party "presents a

sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that

one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## IV.  Analysis

### Article 9 of the Uniform Commercial Code

Of the various issues raised in the cross-motions for summary judgment, only the issue of

whether the ultimate disposition of the automobile was subject to the dictates of the Universal

Commercial Code (U.C.C.) merits affirmative relief at this stage.[2]  Plaintiffs contend that

Defendant failed to comply with the default, notice, and deposition requirements of Article 9 of

the U.C.C. by: (1) taking possession of the automobile even though Plaintiffs were not in default;

(2) failing to provide to Plaintiffs any notice of disposition after the "taking;" and, (3) failing to

---

[2] The remaining issues will be addressed in the context of dispositive relief being
unavailable because of the existence of disputed material facts.

dispose of the automobile in a lawful and commercially reasonable manner.  (Compl. at ¶¶ 91-93.)  In support of their arguments, Plaintiffs cite to the prior decisions of this Court in <u>Padin v. Oyster Point Dodge</u>, 397 F. Supp. 2d 712 (E.D. Va. 2005), and <u>Barnette v. Brook Road, Inc.</u>, 457 F. Supp. 2d 647 (E.D. Va. 2006), in contending that "a dealer that initially delivers the automobile, and later cancels the contract and retakes possession of the collateral, is governed by and subject to U.C.C. Article 9."  (Pls.' Am. Mem. at 29.)  Plaintiffs contend that they are "debtors" as defined by § 8.9A-102 of the U.C.C. because when the automobile was surrendered back to Defendant, Plaintiffs still maintained an ownership and possessory interest in it, and they otherwise remained "obligors" pursuant to the RISC to Defendant for the loan payments.  (<u>Id.</u> at 29-30.)  Plaintiffs specifically contend that Defendant's notice of disposition to Plaintiffs, in which Defendant informed Plaintiffs that a public auction would be held, was insufficient because the automobile was actually sold at a subsequent private sale without them being given additional notice.  (<u>Id.</u> at 31.)  Essentially, Plaintiffs are arguing that the time, place, manner, and notice of the ultimate disposition of the vehicle were in violation of Article 9 where such circumstances were not "commercially reasonable" as required.  (<u>Id.</u> at 28.)  Plaintiffs fail, however, to provide any relevant authority for their specific contention that, assuming Article 9 of the U.C.C. applied, Defendant was required to provide a second notice of sale after the initial one.

Defendant responds by emphasizing that it did not "take" the vehicle from Plaintiffs; rather, Plaintiffs decided that they no longer wanted the vehicle, even if Defendant could arrange for financing, and that they returned the vehicle to the dealership voluntarily.  (Def.'s Mem. at 15.)  Defendant also contends that even if its retention of the vehicle after Plaintiffs returned it to

the dealership constituted a "taking," Plaintiffs were in default and not entitled to any notice or other protection afforded by Article 9 because they signed two RISCs for the sale of the vehicle, but they never made a payment on the vehicle, and they instructed their bank to stop payment on the single down payment check they had provided.  (<u>Id.</u>)  Thus, according to Defendant, Plaintiffs had no interest in the collateral as a debtor as required by Article 9 for it to apply.  (<u>Id.</u> at 16.)  Finally, Defendant argues that it nevertheless provided Plaintiffs with a notice of disposition after the alleged taking when it sent Plaintiffs a letter advising them of the opportunity for them to redeem the vehicle and informing them of the date, time, and location of the public auction where the vehicle would be offered for sale.  (<u>Id.</u>)  Accordingly, Defendant asserts that even if Article 9 did apply to the transaction, Defendant fully complied with all necessary requirements.  (<u>Id.</u> at 16-17.)

The core issues before the Court pertaining to the Article 9 claim are: (1) whether Article 9 applied to the transaction at issue at all; and (2) if so, whether Defendant complied with its provisions, including whether Defendant was required to provide Plaintiffs with a second notice of disposition after the automobile did not sell at the initial public auction of which Plaintiffs were on notice.

Article 9, and the corresponding state statute, Virginia Code § 8.9A, apply to "a transaction, regardless of its form, that creates a security interest in personal property . . . ."  Va. Code Ann. § 8.9A-109.  A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation."  Va. Code Ann. § 8.1-201(37).  Furthermore, a debtor is defined as "a person having an interest, other than a security interest or other lien, in the collateral . . . ."  Va. Code. Ann. § 8.9A-102(A).

-6-

Plaintiffs contend that they are "debtors as defined by § 8.9A-102, since at the time the car was returned to Defendant, Plaintiffs allegedly had an ownership and possessory interest in the vehicle." (Pls.' Am. Mem. at 29-30.)  Plaintiffs also contend that they are "obligors" as defined by the Code whereby an obligor is " a person that, with respect to an obligation secured by a security interest in . . . the collateral, (i) owes payment or other performance of the obligation . . . ."  Va. Code Ann. § 8.9A-102(59); (Pls.' Am. Mem. at 30.)

Plaintiffs, however, readily admit that they had no interest in keeping the vehicle, and did not think that they were obligated to make payments on the automobile because there was no contract in effect.  (Def.'s Mem., Ex. A (Pls.' Dep.) at pgs. 60-61.)  Indeed, at their respective discovery depositions, Plaintiffs confirmed that when they returned the car to Defendant, they did not believe that a consummated deal for the purchase of the vehicle had occurred; they did not believe that they had a contract to make monthly payments on the vehicle; and they did not believe that they were the owners of the vehicle.  (Id.)  In fact, Plaintiffs never made a monthly payment towards the purchase of the automobile, and they even instructed their bank to stop payment on their check for the down payment on the vehicle.  (Id.)  Accordingly, based on Plaintiffs' own concessions, they either never had a security interest in the vehicle, or they effectively rescinded their interest such that they were not "debtors" subject to application of Article 9.  Va. Code Ann. § 8.9A-109;  Va. Code Ann. § 8.1-201(37).

In their cross-motion for summary judgment, Plaintiffs contend that the transaction was, in fact, governed by Article 9, because "even those without an ownership interest, called a 'secondary obligor' in consumer transactions," can be considered a "debtor" under the Article. (Pls.' Am. Mem. at 29.)  According to Plaintiffs, secondary obligors enjoy the protection of the

statute.[3]  (Id.)  Plaintiffs fail to explain, and the statutory definition certainly does not clarify, what a "secondary obligor" is or how Plaintiffs fall within this category.  The only support offered by Plaintiffs is a citation to the decision in Barnette, 457 F. Supp. 2d at 658-59.

Barnette also involved a failed transaction to purchase a car, and the subsequent repossession of that car after financing could not be obtained.  Id. at 650.  In Barnette, the parties signed a RISC, but the financing institutions that were contacted declined to provide the necessary financing for the purchase.  Id. at 653.  Barnette had already paid a $500 down payment on the car at the time financing was declined.  Id.  The defendant then repossessed the car, and did not notify Barnette prior to the re-sale of the automobile.  Id. at 653-54.  The court held that the transaction was subject to Article 9, regardless of the fact that Barnette never obtained title to the car, because she had made a down-payment and assumed the obligation of monthly installment payments.  Id. at 658.  Accordingly, summary judgment was granted to Barnette because as a "debtor," under Article 9, the defendant was required to provide her with notice of the intended disposition of the car, and failed to do so.  Id. at 659.

The facts in this case are distinguishable from those in Barnette.  Here, Plaintiffs admittedly stopped payment on the down payment check.  (Def.'s Mem., Ex. A (Pls.' Dep.) at pg. 60-61.)  Plaintiffs further admit that they did not think that a valid contract ever existed between the parties, and that they were never subject to an obligation to make monthly payments.  (Id.)  There is no mention by the Barnette court of the "secondary obligor" provision

---

[3] A "secondary obligor" is defined by statute as "an obligor to the extent that: (A) the obligor's obligation is secondary; or (B) the obligor has a right of recourse with respect to an obligation secured by collateral against the debtor, another obligor, or property of either."  Va. Code Ann. § 8.9A-102(71).  Such a definition is hardly a model of legislative clairvoyance.

cited by Plaintiffs.  Accordingly, the court's holding in <u>Barnette</u> contradicts, rather than supports, Plaintiffs' assertion that the transaction was subject to Article 9.

Finally, Defendant asserts, in the alternative, that even if the transaction was subject to the provisions of Article 9, Defendant provided Plaintiffs with proper notice of the intended disposition of the vehicle subsequent to Plaintiffs' voluntary return of the vehicle to Defendant. (Def.'s Reply Br. at 9.)  Under U.C.C. Article 9, sections 610-612, a secured party may sell the collateral after default, but it must provide notification of disposition that "(A) describes the debtor and the secured party; (B) describes the collateral that is the subject of the intended disposition; (C) states the method of intended disposition; (D) states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and (E) states the time and place of a public disposition or the time after which any other disposition is to be made."  Va. Code Ann. §§ 8.9A - 610-12.

Defendant asserts that its Vice-President sent Plaintiffs a timely letter advising them of their right to redeem the vehicle.  (Def.'s Mem. at 16.)  The letter informed Plaintiffs of the date, time, and location of a public auction where the vehicle would be offered for sale.  (<u>Id.</u>)  The public auction occurred on May 8, 2006, but Plaintiffs did not attend.  Defendant was not able to sell the vehicle at the auction, and instead sold it in a private transaction the following month.

Plaintiffs acknowledge that they received the original notice informing them of the public auction, but they claim that because the vehicle was actually sold later at a private sale, they were entitled to a second notice of its intended disposition.  (Pls.' Am. Mem. at 32.)  Plaintiffs cite  authority in support of the proposition from parallel district courts and state supreme courts, as well as one case from this Court, <u>Padin v. Oyster Point Dodge</u>, 397 F. Supp. 2d 712 (E.D. Va.

2005).  However, they fail to explain how such authorities support their argument that they were entitled to a second notice and, in fact, the cited authority appears to be inapposite.  For example, the facts in <u>Padin</u> are similar to the facts in this case and in <u>Barnette</u>, but the issue of a requirement for multiple notices was not addressed.  The plaintiff in <u>Padin</u> signed a RISC with the defendant car dealership, but financing could not be obtained.  <u>Id.</u> at 715-17.  The defendant then repossessed the car after the plaintiff's payment of one installment, and failed to give the plaintiff notice of its intended disposition of the automobile.  <u>Id.</u> at 717.  <u>Padin</u> is factually distinct from the current case in that a security interest was, in fact, created as a result of both the terms of the RISC and the fact that the plaintiff made one installment payment.  Here, no payments were ever made and Plaintiffs testified that they thought they were never under any obligation to make payments.  Finally, there is nothing in the Court's holding in <u>Padin</u> that stands for the proposition that further notice is required under Article 9 if the collateral is not disposed of pursuant to an initial notice.

Plaintiffs also fail to cite to any statutory authority from the Uniform Commercial Code or the Virginia Code which mandates that a party must provide secondary notice of the intended deposition of the collateral following an initial notice that complies with Article 9.  Regardless, however, the transaction here was not governed by Article 9 because a security interest did not exist at the time of the disposition of the automobile so as to entitle Plaintiffs to the protection of the statute.  Accordingly, Defendant's motion for summary judgment will be GRANTED IN PART and Plaintiffs' cross-motion for summary judgment will be DENIED as to the claim made pursuant to Article 9.

## V.  Remaining Issues

Dispositive relief must be denied on the remaining claims because of the existence of disputed material facts as to each claim.

**a.      Equal Credit Opportunity Act ("ECOA") Claim**

On February 25, 2006, Defendant accessed Plaintiffs' credit reports with Plaintiffs' express permission.  (Pls.' Am. Mem. at 3-4.)  Thereafter, on March 3, 2006, and March 14, 2006, Defendant verbally advised Plaintiffs that their successive loan applications had been rejected, but it failed to provide Plaintiffs with written notice of the adverse actions regarding the rejections.  (Id. at 7-8.)  Plaintiffs claim that Defendant violated ECOA when it accessed Plaintiffs' credit reports on a subsequent occasion to that to which they had consented and failed to notify Plaintiffs, in writing, of the adverse actions taken regarding their credit applications. (Compl. at 6-7.)

There are disputed material facts concerning the ECOA claims.  The parties dispute whether Defendant was, in fact, a creditor that was required to provide written notice of any adverse action, and whether Defendant ever took any adverse action against Plaintiffs that would require such notices to be sent.

**b.  Fair Credit Reporting Act ("FCRA") Claim**

In Count Two of the Complaint, Plaintiffs contend that, at the very least, the subsequent and final credit pull of March 14, 2006 also violated the FCRA.  (Compl. ¶¶ 62-63.)  Plaintiffs further assert that Defendant's failure to send an adverse notice to Plaintiffs on each credit denial or termination decision also violated the FCRA, and in the alternative, any notices that were provided did not comply with the Act.  (Id. at ¶¶ 64-65.)  Defendant contends that contrary to

Plaintiffs' assertions, Plaintiffs in fact signed credit applications on February 25, 2006 and March 5, 2006, which specifically authorized Defendant to obtain Plaintiffs' credit reports on the occasions they were obtained.  (Def.'s Mem. at 10.)  Defendant further asserts that it had a "permissible purpose" in obtaining Plaintiffs' credit reports, in any event, and therefore its actions were not in violation of the FCRA.  (Id.)

There is a genuine issue of disputed material fact as to the point when the business relationship between Plaintiffs and Defendant terminated, and such a factual issue goes to the crux of Plaintiffs' FCRA claim because that fact determines whether Defendant's subsequent credit "pull" was unauthorized where, if the business relationship was still in effect, such activity for legitimate business purposes is sanctioned by the FCRA without the necessity of explicit consent of the consumer.  15 U.S.C. § 1681b(a)(3)(A).  Also, there is material dispute as to whether Defendant ever took any adverse action as a "participating creditor" against Plaintiffs that would require written notice to be provided.  See Padin, 397 F. Supp. 2d 712.[4]

**c.  Virginia Consumer Protection Act ("VCPA") Claim**

In Count Three of the Complaint, Plaintiffs contend that Defendant violated the VCPA by:

   a.   stating that financing was approved when it had not been;
   b.   failing to sign the title to the automobile over to Plaintiffs at the time of
        sale to transfer ownership to them;

---

[4] While it appears that the CitiFinancial tentative approval did not allow for Defendant to add on any interest and thus become a "participating creditor" (rather than merely a "referring creditor" that is not required to provide written notice of adverse action), the situation involving the initial response from Bank of America is not so clear, at present, aside from whether there were other aspects to the situation that may have "made" the Defendant into a "participating creditor" that had to provide written notice of adverse actions.

      c.        failing to immediately process the documents and pay the fees to the Department of Motor Vehicles after charging Plaintiffs to perform those services for them;

      d.        accepting a down payment of the contract that it had cancelled;

      e.        utilizing the "Spot Delivery" sales scheme in this manner;

      f.        advertising that Starr Motors guaranteed instant approval on its auto loans; and,

      g.        using other fraudulent and deceptive representations in its business in a manner in which deceived Plaintiffs.

(Compl. ¶ 72.)  Defendant responds by asserting that it did not inform Plaintiffs that financing had been approved until February 27, 2006, two days after Plaintiffs decided to purchase the vehicle and after it had submitted the initial credit application.  (Def.'s Mem. at 13.) Accordingly, Defendant asserts that it only informed Plaintiffs that financing had been approved after the computerized response from Bank of America (Dealer Track) showed a "green check," that, according to Defendant, indicated that the loan had been approved.  (Id.)

      There are disputed, material facts surrounding Plaintiffs' VCPA claims as well.  One disputed fact is whether Defendant knew of Plaintiffs' self-employment status when it received the initial approval from Bank of America (with the stipulation that approval was conditioned on no self-employment), such that Defendant's representation to Plaintiffs at that juncture that their application had been approved was knowingly false.  Another disputed fact is whether Defendant had reason to know that a "green check" in Dealer Track still meant only conditional approval, such that any representations to Plaintiffs that the "deal was done" were at least misleading and a sufficient basis for the claim.

**d.      Fraud Claims**

In Plaintiffs' cross-motion for summary judgment, they represent that in order "[t]o simplify the issues in this case . . . Plaintiffs withdraw the [] Fraud claim."  (Pls.' Am. Mem. at 20.)

Accordingly, Defendant's and Plaintiffs' motions for summary judgment will be DENIED as to the ECOA, FCRA, and VCPA claims with Plaintiffs' fraud claim being DISMISSED AS WITHDRAWN.

## VI.  Outstanding Motions

Defendant's motion to strike Plaintiffs' cross-motion for partial summary judgment (docket entry no. 32) and Defendant's Motion to Vacate the Court's April 29, 2008 Order (docket entry no. 43) will be DENIED, the issues raised therein being effectively rendered MOOT with this ruling.

An appropriate Order shall issue.

_____/s/_____
Dennis W. Dohnal
United States Magistrate Judge

Date:  May 12, 2008
Richmond, Virginia